## SPORTWEAR HOSIERY MILLS v. COMMISSIONER OF INTERNAL REVENUE.

No. 7922.

Circuit Court of Appeals, Third Circuit.

Argued April 7, 1942.

Decided June 25, 1942.

George E. H. Goodner, of Washington, D. C. (Helen Goodner, of Washington, D. C., on the brief), for appellant.

Bernard Chertcoff, Sp. Asst. to Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch, Sp. Asst. to Atty. Gen., for appellee.

Before BIGGS, JONES, and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

The petitioner, a corporation with principal place of business in Pennsylvania, seeks review of the action of the Board of Tax Appeals affecting its liability for income and unjust enrichment taxes for the year 1936. There are three questions involved.

██ The first has to do with the correctness of the Commissioner's action regarding the deduction made for salary for Fannie Goldberg, secretary of the corporation. She became the owner in 1936 of ⅓ of the common and ⅔ of the preferred stock of the company. She was thereafter voted $125 per week salary. This amount, so far as concerns a deduction for tax purposes, was reduced by the Commissioner as excessive. The Board of Tax Appeals upheld the Commissioner. The taxpayer, of course, had the burden of persuasion upon the point that the Commissioner was wrong.[1] The Board heard the evidence and reached a conclusion sustaining him. It is well settled that the reasonableness of such allowance is a question of fact[2] and equally clear that a conclusion of fact is binding upon us if supported.[3] We have read the testimony set out in the petitioner's appendix. No good purpose would be served by repeating it. It is sufficient to say that the conclusion of the Board is not to be disturbed upon this point.

The second question concerns the construction of § 14(c)(1) of the Revenue Act of 1936. Section 14[4] imposes a graduated surtax on undistributed corporate profits. The amount of the tax depends upon the excess of the adjusted net income (net income minus a credit for normal tax and other credits, not relevant here) over the undistributed net income (adjusted net income minus a credit for dividends paid and other credits, not material here) and as this increases, the tax due decreases.[5]

The problem in this case is concerned only with the effect of a paragraph providing for a "Specific credit". Section 14(c)(1) provides:

"(1) Specific credit. If the adjusted net income is less than $50,000, there shall be allowed a specific credit equal to the portion of the undistributed net income which is in excess of 10 per centum of the adjusted net income and not in excess of $5,000, such credit to be applied as provided in paragraph (2)."[6]

[1] Long Island Drug Co., Inc., v. Commissioner of Internal Revenue, 2 Cir., 1940, 111 F.2d 593, certiorari denied 1940, 311 U.S. 680, 61 S.Ct. 49, 85 L. Ed. 438; H. Levine & Bros., Inc., v. Commissioner of Internal Revenue, 7 Cir., 1939, 101 F.2d 391; Smith v. Russell, 8 Cir., 1935, 76 F.2d 91, 93, certiorari denied 1935, 296 U.S. 614, 56 S. Ct. 135, 80 L.Ed. 436; A. David Co. v. Grissom, 4 Cir., 1933, 64 F.2d 279; Am-Plus Storage Battery Co. v. Commissioner of Internal Revenue, 7 Cir., 1929, 35 F.2d 167; Twin City Tile & Marble Co. v. Commissioner of Internal Revenue, 8 Cir., 1929, 32 F.2d 229.

[2] Long Island Drug Co., Inc., v. Commissioner of Internal Revenue, supra; H. Levine & Bros., Inc., v. Commissioner of Internal Revenue, supra; Sunset Scavenger Co., Inc., v. Commissioner of Internal Revenue, 9 Cir., 1936, 84 F.2d 453; Doernbecher Mfg. Co. v. Commissioner of Internal Revenue, 9 Cir., 1935, 80 F.2d 573; General Water Heater Corp. v. Commissioner of Internal Revenue, 9 Cir., 1930, 42 F.2d 419.

[3] H. Levine & Bros., Inc., v. Commissioner of Internal Revenue, supra; Sunset Scavenger Co., Inc., v. Commissioner of Internal Revenue, supra; Am-Plus Storage Battery Co. v. Commissioner of Internal Revenue, supra; Twin City Tile & Marble Co. v. Commissioner of Internal Revenue, supra.

[4] § 14, Revenue Act of 1936, 26 U.S. C.A. Int.Rev.Acts, pages 823–825.

[5] § 14(b). Thus if a corporation has an adjusted net income of $100,000 and an undistributed net income of the same amount, there is no excess of the former over the latter. But if the corporation with the same adjusted net income has, by dividend payments, reduced its undistributed net income to $25,000, there is an excess of the former over the latter of $75,000. The greater this excess, the less tax the corporation is called upon to pay.

[6] § 14(c)(2) taxes the specific credit allowed at 7%. The undistributed net income less the credit is then taxed at the regular surtax rates.

Despite taxpayer's argument that the meaning of this paragraph is clear, we think an ambiguity is apparent: namely, whether the clause "not in excess of $5,000" modifies "the portion of the undistributed net income" or the entire clause which precedes it. This ambiguity we must resolve to reach a decision in this case.

Treasury Regulation 94, Article 14-3 adopts the first view.[7] The Commissioner followed this construction and allowed the taxpayer a specific credit of $3,416.84 on its adjusted and undistributed net incomes of $15,831.62. The two were identical in this case for no dividends were declared for the tax year in question. The taxpayer adopts the alternative view and claims a credit of $5,000.[8] The only question involved in this part of the case is which of the two views is the one to be followed.

■ The question is by no means free from difficulty. The Treasury Regulation cannot, of course, change the law, but where two interpretations are possible, as here, the administrative view counts for something. Fawcus Machine Co. v. United States, 1931, 282 U.S. 375, 378, 51 S.Ct. 144, 75 L.Ed. 397. A majority of the Board of Tax Appeals in this case, supported the Commissioner's interpretation. So does a square decision of the 6th Circuit. Black Motor Co., Inc., v. Commissioner of Internal Revenue, 6 Cir., 1942, 125 F.2d 977, petition for rehearing denied, April 6, 1942. Apart from authority, we think that the construction offered by the Commissioner leads to more consistent results and presumably, therefore, is within the Congressional intent. A construction is unreasonable when it produces an absurdity,[9] and some of the results of applying the taxpayer's construction are at least incongruous. For example:

A corporation with an adjusted net income of $50,000 is not entitled to a specific credit. If its undistributed net income is also $50,000, its tax under § 14 would be $10,250. If the corporation's adjusted and undistributed net incomes were one cent less or $49,999.99, it would fall within § 14(c)(1). Under the taxpayer's construction the tax would be $9,250 or $1000 less; under that of the Commissioner, $10,250.[10] The specific credit would be $5000 and 0 respectively.

We believe that the meaning ascribed to § 14(c)(1) by the Treasury Regulations is the more reasonable. By it the specific credit decreases proportionately as the adjusted net income approaches the $50,000 limit and the undistributed profit tax approaches uniformly, not by leaps and bounds, the tax at the $50,000 level.[11]

The petitioner supports its construction by two major arguments. First, it maintains that under the interpretation urged by the Commissioner, every corporation, regardless of the size of its undistributed net income is alloted up to $5,000 of that

---

[7] "Art. 14-3. *Specific credit if adjusted net income is less than $50,000.*—Section 14(c) provides for a specific credit in the case of a corporation which has an adjusted net income of less than $50,000. This specific credit is an amount equal to the excess of $5,000 or the total undistributed net income, whichever is less, over 10 percent of the adjusted net income and is to be deducted from the undistributed net income before computing the surtax. After deducting the specific credit from the undistributed net income a surtax is computed on the remainder. The computation is made first according to the brackets as set forth in section 14(b). Then there is added 7 percent of the amount of the specific credit. The sum is the total surtax on the corporation's net income."

[8] Petitioner would compute the specific credit on this basis: undistributed net income minus 10% of the adjusted net income, provided the difference at the least equals or is not in excess of $5,000; if it is, the specific credit is $5,000.

[9] Stonega Coke & Coal Co. v. Commissioner of Internal Revenue, 3 Cir., 57 F. 2d 1030, 1031: Appeal of H. J. Schlesinger, 1926, 5 B.T.A. 943.

[10] The taxes at $50,000 and at $49,999.99 are technically not the same, if in the latter instance, the computation is carried past the first two decimal places.

[11] Thus,

| Adjusted Net Income | Undistributed Net Income | Specific Credit | Tax |
|---|---|---|---|
| $1,000 | $1,000 | $900 | $70 |
| $5,000 | $5,000 | $4500 | $350 |
| $10,000 | $10,000 | $4000 | $1250 |
| $15,000 | $15,000 | $3500 | $2375 |
| $20,000 | $20,000 | $3000 | $3500 |
| $25,000 | $25,000 | $2500 | $4625 |
| $30,000 | $30,000 | $2000 | $5750 |
| $35,000 | $35,000 | $1500 | $6875 |
| $40,000 | $40,000 | $1000 | $8000 |
| $45,000 | $45,000 | $500 | $9125 |
| $49,900 | $49,900 | $10 | $10,227.50 |
| $50,000 | $50,000 | 0 | $10,250 |

income for taxation at 7%.[12] If Congress had intended this result, it could, so runs the argument, easily have so provided. But it did not.

But the taxpayer oversimplifies the effect of the supposed intent of Congress. If we look for a moment at the Commissioner's interpretation, it becomes apparent that it produces an additional result which would not have been accomplished had Congress worded § 14(c) (1) in the manner petitioner speaks of. The illustrations in footnote 11 show that as the adjusted net income approaches $50,000, the specific credit decreases. By § 14(c) (2) (A), the specific credit is deducted from the undistributed net income. Thus, the final amount of undistributed net income subject to surtax rates depends, in part, upon the amount of the specific credit. Since the surtax rates are graduated, § 14(b), that is higher as the undistributed net income increases, the lower the specific credit, the greater is the portion of undistributed net income subject to those higher surtax rates. Thus, although $5,000 is always taxed at 7%, the respective amounts of its components (the specific credit and 10% of the adjusted net income), which admittedly are variable, determine the final surtax rates applicable, and hence, the total tax.

Secondly, the taxpayer argues that its construction in allowing a larger specific credit effectuates the intent of Congress to favor small corporations; that under the Regulations the specific credit is determined without regard to the undistributed net income.[13] This argument is ingenious but is less forceful when it is borne in mind that Congress did not make the rate of the tax to be paid dependent upon the amount of undistributed net income alone. We believe that the sought for Congressional purpose would be better attained if, as the corporation's adjusted net income approached $50,000, the specific credit decreased. This result is obtained under the Regulations. However, under the taxpayer's construction, any corporation with an undistributed net income of $5,555.55 and thus necessarily an adjusted net income of at least the same amount, or anywhere in excess of that sum, would have a specific credit of $5,000.[14] It may be conceded that the specific credit is computed independently of the undistributed net income. But it cannot be overlooked that the specific credit is but one of the factors which determines the final amount of the tax. The size of the undistributed net income, although usually not a real factor in arriving at the specific credit, is very important in the determination of tax liability. After all, the total effect of § 14 is to determine the amount of the tax to be paid, and as such its subdivisions define the separate components to be considered together in arriving at the final result.

■ On this question, therefore, we agree with the conclusion of the Commissioner, the Board of Tax Appeals, and the Sixth Circuit.

■ The third point involves petitioner's liability under § 501(a) (2) of the Unjust Enrichment Act.[15] That section imposes a tax "equal to 80 per centum of the net income from reimbursement received by such person from his vendors of amounts representing Federal excise-tax burdens included in prices paid by such person to such vendors, to the extent that such net income does not exceed the amount of such Federal excise-tax burden which such person in turn shifted to his vendees." The primary purpose of this act was to tax the profits realized in the form of refunds as a result of the Agricultural Ad-

---

[12] Under the Commissioner's view, whenever the undistributed net income is $5000 or more, the specific credit, $5000 minus 10% of the adjusted net income, is taxable at 7% (§ 14(c) (2) (B) ) and the 10%, itself is taxable at the same rate (§ 14(b).

[13] Taxpayer offers this illustration.

| Adjusted Net Income | Undistributed Net Income | Specific Credit |
| --- | --- | --- |
| $49,000 | $6,000 | $100 |
| $49,000 | $16,000 | $100 |
| $49,000 | $26,000 | $100 |
| $49,000 | $46,000 | $100 |

The Sixth Circuit Court of Appeals in Black Motor Co., Inc., v. Commissioner of Internal Revenue, supra, denied a petition for rehearing based in part on this argument.

[14] See f.n. 8. The minimum undistributed net income needed for a specific credit of $5000, $5555.55, is determined as follows:

$U - 10\%A = 5000$, since $U = A$, see infra.,
$U - 10\%U = 5000$
$90\%U = 5000$
$U = 5555.55$

$U$ = Undistributed net income
$A$ = Adjusted net income, which here at the least, is necessarily the same as the undistributed net income so that, $U = A$.

[15] Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts pages 944–950.

justment Act[16] being declared unconstitutional,[17] in those cases where the taxpayer had passed the processing tax on to his vendees.[18]

In 1936 petitioner was paid back by its vendors the amount of $15,030.34 on cotton yarn it had previously purchased. Petitioner filed an unjust enrichment return, but reported no tax liability. The Commissioner determined a deficiency in tax of $1,314.37 on unjust enrichment in the amount of $2,737.29. Of this sum $954.74 represented payments from one concern, Clyde Fabrics, received through its broker, the Palmetto Yarn Corporation and $1,417.23 from another, the Johnston Mills Company. These payments do not appear to have been made pursuant to contract.[19] The Board of Tax Appeals sustained the Commissioner's determination.[20]

Petitioner, on appeal to this Court, pressed the same three contentions it had raised before the Board. We shall consider them in order.

First. Petitioner maintains that its vendors did not shift to it the burden of the tax because the goods were invoiced at a flat rate per pound, the processing tax not being identified as a separate item of cost. All but one of the cases cited in support of this contention involved suits by purchasers to recover from their vendors monies paid for taxes which were later declared invalid. They are governed by principles of contract law which are not controlling here. The exception is Cudahy Packing Co. v. United States, D.C.N.D.Ill.1941, 37 F.Supp 563. That case involved a suit for refund of processing taxes paid to the United States and although the District Court held that when the tax was absorbed in the price, the tax burden was not shifted, on appeal, that decision was reversed. 7 Cir., 1942, 126 F.2d 429. The Circuit Court of Appeals held that title VII[21] not only referred to "legal burden" (where the tax is added as an identifiable item), but also to "economic burden" (where the tax is absorbed in the total price).

We believe that the same meaning is to be given to title III. As the Commissioner points out, the language used in that section of the Act shows that it was meant to include a shift in the tax burden whether direct or indirect. Thus, 501(e) prescribes that the extent of the shift of the burden may be determined by deducting from the selling price the cost of the articles sold plus the average margin with respect to the quantity involved. See, also, §§ 501(a) (2), 501(d), 501(f) and 501(i). Finally, the Committee Reports reveal that the framers of the statute had in mind that any actual shift of burden should fall within the Act.[22]

The Board of Tax Appeals stated that when the petitioner sold its product to its customers it included "in the sales price the burden of the processing taxes which it had paid to its vendors." The testimony of taxpayer's officers does not contradict the Board's finding of fact. Admittedly the tax was charged, as a separate

---

[16] 7 U.S.C.A. § 601 et seq.

[17] United States v. Butler, 1936, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914; Rickert Rice Mills, Inc., v. Fontenot, 1936, 297 U.S. 110, 56 S.Ct. 374, 80 L.Ed. 513.

[18] White Packing Co. v. Robertson, 4 Cir., 1937, 89 F.2d 775, 778.

[19] It is stated as a fact by the taxpayer and not denied by the Commissioner that it was a common practice in the cotton industry to provide in contracts for the purchase of cotton, that the processing taxes paid by vendees to their vendors would be refunded if the Agricultural Adjustment Act was declared to be invalid within a certain time.

[20] 1941, 44 B.T.A. 1026.

[21] Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts pages 960–971. This title covers refunds of processing taxes by the United States. The taxpayer must show that he has not shifted the tax burden "directly or indirectly".

[22] Seidman's Legislative History of Federal Income Tax Laws (1938) pp. 267 and 269. The Senate Finance Committee Report on § 501(a) (1) states that the tax is applicable, "to the extent that this net income is attributable to the fact that the taxpayer shifted all or part of the excise-tax burden directly or indirectly to others. This, of course, does not depend on whether or not the shift of the excise-tax burden was to his vendees or his vendors, or on whether or not it was intentional or express, but depends upon the extent to which the taxpayer's margin between prices and costs covered his normal profit margin and also all or part of the amount of the excise." And on § 501 (a) (2) "Dealers who receive reimbursement from their vendors for any amount of excise-tax burdens will be taxable on such reimbursement to the extent that such dealers have shifted such excise-tax burdens, in whole or in part, to their customers in any manner."

item, to vendees on contracts in force on August 1, 1933. Subsequently, the tax was not invoiced as an identifiable charge. There was uncertainty and lack of positive knowledge whether August prices were increased over previously prevailing figures. No books or records were produced to show the absence of such increase. We think it is clear that the petitioner failed to carry its burden of proof in this respect.

Second. Petitioner argues that since its vendors were not legally obligated to reimburse it, the refunds were gifts or gratuities, and in any event not income. The general question whether a given payment is to be treated as a gift or compensation is one which has caused some difficulty.[23] All the authorities agree however that to have a gift there must be a donative intent on the part of the transferor.[24] The Board found in this case that there "is no evidence that they [the repayments] were made with a donative intent," and to the extent that this conclusion is reviewable by us,[25] we agree with the Board.[26]

Nor can it be doubted, we think, that the payments were income to the petitioner. The non-existence of a legal obligation to reimburse the petitioner is not controlling. The situation wherein bonuses paid to employees were held to be taxable as income is a good illustration of this.[27] The courts have tended to treat that situation not as a gift, but as voluntary additional compensation for services rendered. So here, we cannot shut our eyes to the real nature of the transactions. The parties involved were buyer and sellers, concerns engaged in continuous business dealings. It is not altogether certain that the Clyde Fabrics and Johnston firms believed that they were under no legal obligation to reimburse petitioner.[28] Be that as it may, we think it is not unreasonable to consider the payments or credits as made for maintaining the good will of the petitioner and encouraging future business. There is no doubt that while the vendors sought, at the least, an intangible benefit, the petitioner realized a real profit. The effect of the refunds was to reduce the price paid by petitioner for the goods which it had previously sold. The payments thus made increased the gain on those sales. It is at this increment of gain that the Unjust Enrichment Act was aimed. This additional profit constituted taxable income.[29]

Third. Petitioner contends that if the reimbursements constitute taxable

[23] See Magill, Taxable Income (1936) pp. 346–356.

[24] Bogardus v. Commissioner of Internal Revenue, 1937, 302 U.S. 34, 58 S.Ct. 61, 82 L.Ed. 32, cf. dissent 304 U.S. at page 44, 58 S.Ct. at page 66, and see footnote 5 in Helvering v. National Grocery Co., 1938, 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346. Botchford v. Commissioner of Internal Revenue, 9 Cir., 1936, 81 F.2d 914, 916; Mulqueen v. Commissioner of Internal Revenue, 2 Cir., 1933, 65 F.2d 365, certiorari denied 290 U.S. 644, 54 S.Ct. 62, 78 L.Ed. 559; Van Sicklen v. Commissioner of Internal Revenue, 1935, 33 B.T.A. 544, 547; Lougee v. Commissioner of Internal Revenue, 1932, 26 B.T.A. 23, affirmed, 1 Cir., 1933, 63 F.2d 112; Binger v. Commissioner of Internal Revenue, 1931, 22 B.T.A. 111, 113.

[25] See Bogardus v. Commissioner, supra; cf. American Dental Co. v. Commissioner of Internal Revenue, 7 Cir., 1942, 128 F.2d 254.

[26] Petitioner's only evidence to show a gift was a reimbursement in the absence of a contract to reimburse and a portion of a letter from the Palmetto Corporation, which read "As stated above, Clyde Fabrics is not obligated to make this $1828.48 adjustment." However, any donative intent which may be inferred from this language is negatived by another sentence, contained in the same letter: "Clyde Fabrics feels that to withhold the issuance of this credit would be placing at a disadvantage one of its friends who placed orders early in the year for late delivery and *has therefore authorized the issuance of the credit as a final settlement of all adjustments arising out of the relief it got as a result of the Supreme Court Decision.*" (Italics added).

[27] See cases collected in Dasteel v. Rogan, D.C.S.D.Cal.1941, 41 F.Supp. 836, and in Poorman v. Commissioner of Internal Revenue, 1941, 45 B.T.A. 73.

[28] See letter quoted above in f.n. 26. It is applicable to Palmetto only; as to Johnston there is no evidence at all on this point.

[29] White Packing Co. v. Robertson, 4 Cir., 1937, 89 F.2d 775, 779, 780. Taxpayer calls our attention to the decision of the 7th Circuit in American Dental Co. v. Commissioner of Internal Revenue, 1942, 128 F.2d 254, 256, decided since the case at bar was submitted. There the court held that the forgiveness, in part, of an accrued indebtedness was not taxable income to the debtor. There was, in that

income, they were not taxable in 1936, but rather in 1935 when the goods were sold. The refunds were received in 1936. As such they were income for that year whether taxpayer was on a cash or accrual basis. Ben Bimberg & Co. v. Helvering, 2 Cir., 1942, 126 F.2d 412.

The decision of the Board of Tax Appeals is affirmed.

JONES, Circuit Judge (dissenting).

It will at once be acknowledged that the construction which the majority of the court place upon Sec. 14(c) (1) of the Revenue Act of 1936 accords with the cognate Treasury regulation (Regulation 94, Art. 14-3), and that the regulation has heretofore received approval in Black Motor Co. v. Commissioner, 6 Cir., 125 F. 2d 977. Notwithstanding the unanimity of such respected opinion, it seems clear to me that the regulation so far departs from the plainly expressed statutory intent as to amount to independent legislation which, of course, is not within the competence of the Treasury. I, therefore, dissent from the action taken by the court on that branch of the case and shall give the reasons for my view.

The tax imposed by the Revenue Act of 1936 on the undistributed net income of corporations is graduated according to successive portions of the undistributed net income which are ascertained by reference to respectively prescribed percentages of the adjusted net income. See subdivision (b) of Section 14. As defined by the Act, Section 14(a) (1), a corporation's "adjusted net income" is its net income less certain tax credits not here material; and, generally speaking, its "undistributed net income", also as defined by the Act, Section 14(a) (2), is its adjusted net income less dividends paid to stockholders.

Section 14(c) (1) provides that,—"If the adjusted net income is less than $50,000, there shall be allowed a specific credit *equal to the portion of the undistributed net income which is in excess of 10 per centum of the adjusted net income and not in excess of $5,000,* such credit to be applied as

provided in paragraph (2)." (Emphasis supplied.) The sole question with which we are presently concerned is as to the meaning of the provision just quoted.

While the designated subject-matter of Section 14(c) (1) is a "Specific Credit", it is not a credit in the sense that the amount thereof is exempted entirely from taxation. What Section 14(c) (1) and (2) does is to remove an amount of the undistributed net income, commensurate with the credit, from surtax in the block of the highest tax rate into which it would otherwise fall under Section 14(b), and subject it to surtax in the block of the lowest tax rate along with what normally falls in that block according to the schedule of Section 14(b). That this is so is fully confirmed by the method prescribed in paragraph (2) of Section 14(c) which provides for the "Application of specific credit".

In the instant case the petitioner's adjusted net income for the year in question was $15,831.62. Its undistributed net income was the same amount, no dividends having been paid to stockholders. In reliance upon Section 14(c) (1), the petitioner took a specific credit of $5,000 in figuring the surtax on its undistributed net income, $5,000 being the upward limit of the credit fixed by the Act, according to the petitioner's interpretation, when the portion of the undistributed net income in excess of 10% of the adjusted net income exceeds $5,000, which it did in this instance. The Commissioner limited the specific credit, however, to $3,416.84 and assessed a deficiency accordingly. The specific credit, which the Commissioner did allow, he derived by taking $5,000 and deducting therefrom 10% of the ($15,831.62) adjusted net income, or $1,583.16. The Board of Tax Appeals (five members dissenting) approved the Commissioner's method of ascertaining the credit. But, does it conform to the formula of the statute?

In support of their action both the Commissioner and the Board of Tax Appeals relied upon Treasury Regulation 94, Art. 14-3, which states in part here material that "This specific credit [under Sec. 14

case, no obligation on the part of the creditor to reduce his claim, nor did he receive any consideration therefor, in the court's view. The learned court said: "As long as there was no consideration for the cancellation, the intent to give necessarily followed." If this language means that in every instance where a

payment is made without consideration the conclusion necessarily follows that a gift has been made, it goes considerably beyond what has previously been thought to be the law. But compare the bonus cases cited supra, n. 27, and see Magill, Taxable Income (1936) pp. 353–356.

(c)] is an amount equal to the excess of $5,000 or the total undistributed net income, whichever is less, over 10 percent of the adjusted net income and is to be deducted from the undistributed net income before computing the surtax. * * *." (There is of course further provision, not here material, that the surtax on the amount of the credit at the lowest rate (7%) is to be added to the surtax otherwise found on the undistributed net income less the specific credit.)

What the regulation actually does is to make the relative clause, "which is in excess of 10 per centum of the adjusted net income", relate to its own conjoined words, "not in excess of $5,000", whereas those words are a correlative part of the relative clause which in its entirety was intended to fix the limits of credit between that (portion of the undistributed net income) which, on the one hand, "is in excess" of a certain amount (10% of the adjusted net income) and that (portion of the undistributed net income) which, on the other hand, "[is] not in excess" of a certain amount ($5,000). In short, the regulation requires that the words ("not in excess of $5,000") be removed from their context and placed in apposition to the words "undistributed net income". Thus the regulation would make the provision read that "there shall be allowed a specific credit equal to the portion of the undistributed net income [,not in excess of $5,000,] which is in excess of 10 per centum of the adjusted net income * * *." But that is not what the statute says, and if that is what Congress intended it to mean, it would have been a very easy matter to have so provided.

In justification of the interpretation which the regulation puts upon Section 14 (c) (1) it is suggested that the regulation promotes a more reasonable result than would the statutory provision if construed as actually written,—that under the regulation the specific credit reduces proportionately as the adjusted net income increases toward the disqualifying limit of $50,000. Assuming for the moment that the result under the regulation would be more equitable as between corporations just over and just under the $50,000 limit with respect to adjusted net income, the answer is that an allowance in the nature of an exemption against tax liability is of necessity arbitrarily fixed. In any circumstances, one is either within or without the embrace of an exemption and, so, entitled or not, as the case may be, to the relief which the exemption affords. It was Congress which limited the right to the credit to corporations having less than $50,000 of adjusted net incomes; and, as thus determined, Congress did not discriminate depending upon whether the corporation has $1,000 or $49,000 of adjusted net income. The statute indicates no intended gradation among the corporations entitled to the credit. Any such considerations would, of course, be for Congress to ponder and resolve. Furthermore, the ambiguity in a statute which invites resort to the rule of construction favoring adoption of that interpretation which produces the more reasonable result must be an ambiguity inherent in the statute as written and not one injected by the very interpretation which is claimed to resolve the doubt or ambiguity. It is submitted that except for the ambiguity which the Treasury regulation itself imputes to Section 14 (c) (1) there is neither doubt nor ambiguity in the provision as written.

But, in reality, the effect of the regulation defeats the intent of Congress as disclosed by the legislative history attending the enactment of the specific credit. The revenue bill[1] of 1936 as it was passed by the House laid a graduated undistributed-profits tax on all corporations but did not provide for any specific credit. When the bill came to the Senate, as passed by the House, the Senate Finance Committee in reporting it with amendments expressed the view[2] that the House bill had "certain fundamental defects" in respect of the undistributed-profits tax plan in that, among other things, "The plan *penalizes the small corporation and the corporation with insufficient reserves* and is of decided advantage to the large corporation and the corporation with excessive surplus." (Emphasis supplied.) Accordingly, the Senate amended the bill by restoring the normal tax on corporations, which the House had eliminated, and by inserting a flat surtax of 7% on undistributed corporate profits, this being in substitution for the undistributed-profits tax adopted by the House. But, still, as amended by the Senate, the bill contained no provision for a specific credit.

It was in conference on the disagreeing votes of the two Houses that Sec. 14(c)

---

[1] H. R. 12395, 74th Cong., 2nd Sess.

[2] Senate Rep. No. 2156, 74th Cong., 2nd Sess.

was first inserted in the revenue bill. While the conference report[3] does not explain the intent of Section 14(c), the situation confronting the conferees and what they did to meet it is enlightening. On the part of the House, the conferees were under the duty of pressing for a restoration of the graduated undistributed-profits tax, with rates running up to 42.5% which the House had already approved. On the other hand, the Senate conferees were under a similar duty to press for the Senate's flat surtax of 7% on undistributed net income, keeping in mind the Senate's desire that some measure of relief be afforded small corporations in need of reserves from earnings for working capital or development. The result of the conference was a normal tax on the net income of corporations and a surtax running up to 27% on their undistributed net income and *the insertion of the specific credit*. The credit, as thus made applicable to small corporations (those having less than $50,000 of adjusted net income), removed an additional part of their undistributed net income from the higher surtax blocks and placed it in the lowest, or 7%, tax rate.

It seems evident that the purpose Congress had in mind in enacting the specific credit was to relieve to a degree from the surtax at the higher rates the undistributed net income of small corporations which, by reason of their financial position, would find it necessary for sound business reasons to retain their net income undistributed. The corporation with sufficient surplus to be able to distribute current earnings currently was in no need of the credit to relieve against the surtax at the higher rates. After all, it is the *undistributed* net income which is subject to the surtax. The corporation therefore which is able to and does distribute its net income escapes or at least greatly minimizes the surtax. Obviously, there was neither occasion nor cause for furnishing a credit to such a corporation, however small. To put the credit on the same basis as between the small corporation able to distribute net income and the small corporation unable so to distribute would work to the dis-

advantage of the one unable to distribute and, by the same token, to the relative advantage of the one able to distribute. That was undoubtedly one of the defects of the bill as written (i.e. without the specific credit) to which the report of the Senate Finance Committee alluded when it said that "The plan penalizes * * * the corporation with insufficient reserves and is of decided advantage to * * * the corporation with excessive surplus" (i.e. surplus sufficient to warrant distribution of current income).

Yet, the effect of the Treasury Regulation is to place all small corporations on a parity with respect to the allowance of the specific credit. And, thereby, it penalizes the small corporation unable to distribute its net income and, at the same time, affords a relative advantage to the corporation able to distribute its earnings. On the other hand, if Section 14(c) (1) is applied, according to its plain terms, it will be found that the distributing corporation is entitled to little or no specific credit, as should be the case. The prospect that any portion of a corporation's undistributed net income will exceed ten per cent of its adjusted net income grows less as net income is distributed.

Take, for example, two corporations each having an adjusted net income of $49,000. The one, finding it necessary to build up reasonable reserves for working capital and future development is unable to make any distribution to its stockholders and retains $49,000 of undistributed net income. Under the Treasury regulation that corporation's specific credit would be $100.[4] The other corporation, possessed of sufficient working capital and under no necessity to build up reserves, distributes $44,000 to its stockholders, leaving it with $5,000 of undistributed net income. Under the regulation the latter corporation's specific credit would be precisely the same as in the case of the first corporation. But, the affluent corporation pays surtax on only $5,000 of undistributed net income at the lowest rate (7%) while the corporation which needs reserves and is therefore unable to distribute its net income is com-

---

3 Conference Report No. 3068, 74th Cong., 2nd Sess., to accompany H. R. 12395.

4 $5,000 less 10% of $49,000 (the adjusted net income), as the Treasury regulation provides. Yet, if the terms of the statute (Section 14(c) (1) ) be applied, it

will be found that "the portion of its [the corporation's] undistributed net income [$49,000] which is in excess of 10 per centum of the adjusted net income [$49,000] and not in excess of $5,000" is $5,000.

pelled to pay a surtax on $49,000 of undistributed net income at the rates of the graduated scale including the highest (27%). Notwithstanding each of the supposed corporations had adjusted net income of $49,000, the financial necessity of the one prevents it from escaping or reducing the surtax by distributing its net income, yet it receives under the regulation the meager credit to which the other corporation is rightly limited under the statute,[5] as herein construed, as well as under the regulation. The obvious effect of the regulation seems to me to run directly counter to what was intended by Congress in the enacted terms of the specific credit.

[5] In the instance of the supposed distributing corporation, the specific credit would likewise be $100 under the statute as written, i. e., the credit would be "equal to the portion of the undistributed net income [$5,000] which is in excess of 10 per centum of the adjusted net income [$49,000] and not in excess of $5,000 * * *."